## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEJANDRO ALEGRE, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) **CIVIL ACTION NO. 08-cv-6144** |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) CLASS ACTION COMPLAINT |
| | ) |
| | ) |
| GILDAN ACTIVEWEAR INC.,  GLENN J. CHAMANDY and LAURENCE G. SELLYN, | ) ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| Defendants. | ) ) |
| | ) |

Plaintiff, Alejandro Alegre ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gildan Activewear Inc. ("Gildan" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Gildan's securities between August 2, 2007 and April 29, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Gildan is a "vertically-integrated marketer and manufacturer of quality branded

basic apparel." The Company is a supplier of activewear for the wholesale imprinted sportswear market in the U.S., Canada and Europe. The Company sells T-shirts, sport shirts and fleece in large quantities to wholesale distributors as undecorated "blanks," which are subsequently decorated by screenprinters with designs and logos. Consumers ultimately purchase the Company's products, with the Gildan label, in venues such as sports, entertainment and corporate events, and travel and tourism destinations.

3.      On April 29, 2008, the Company shocked investors when it announced that it was reducing its second quarter 2008 earnings guidance from $0.42 per share to $0.35 per share, and reducing its fiscal 2008 earnings guidance from $1.85-$1.90 to $1.45-$1.50 per share. The Company stated that this was due to lower than projected unit sales growth in activewear (as a result of a shortfall in production for the Dominican Republic textile facility), a write-down of inventories of discontinued retail product-lines, and additional costs incurred to service mass-market retailers during the integration of retail information systems.

4.      Upon the release of this news, the Company's shares fell $10.99 per share, or 30.6 percent, to close on April 29, 2008 at $24.93 per share, on unusually heavy trading volume.

5.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company's Dominican Republic textile facility was underperforming; (2) that as a result, sales of the Company's activewear were performing below expectations; (3) that the Company had materially overstated its financial results by failing to timely write-down an impairment in the value of its inventories; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being

and future business prospects were lacking in any reasonable basis when made.

6.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.      Plaintiff, Alejandro Alegre, as set forth in the accompanying certification, incorporated by reference herein, purchased Gildan's securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.      Defendant Gildan is a Canadian corporation with its principal executive offices

located at 725 Montée de Liesse, Montreal, Quebec, Canada.

13.    Defendant Glenn J. Chamandy ("Chamandy") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO").

14.    Defendant Laurence G. Sellyn ("Sellyn") was, at all relevant times, the Company's Chief Financial and Administrative Officer ("CFO") and Executive Vice-President.

15.    Defendants Chamandy and Sellyn are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Gildan's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

16.    Gildan is a "vertically-integrated marketer and manufacturer of quality branded basic apparel."  The Company is a supplier of activewear for the wholesale imprinted sportswear market in the U.S., Canada and Europe. The Company sells T-shirts, sport shirts and fleece in

large quantities to wholesale distributors as undecorated "blanks," which are subsequently decorated by screenprinters with designs and logos. Consumers ultimately purchase the Company's products, with the Gildan label, in venues such as sports, entertainment and corporate events, and travel and tourism destinations.

**Materially False and Misleading
Statements Issued During the Class Period**

17.    The Class Period begins on August 2, 2007.  On this day, the Company issued a press release entitled "Gildan Activewear Announces Third Quarter Results, Updates Full Year 2007 Guidance and Initiates EPS and Capital Expenditure Guidance for Fiscal 2008."  Therein, the Company, in relevant part, stated:

> **EPS and Capital Expenditure Guidance for Full Year Fiscal 2007 and 2008**
>
> The Company expects that the impact of the Kentucky Derby Hosiery acquisition will continue to be slightly dilutive to EPS in the fourth quarter of fiscal 2007. Consequently, the Company now expects adjusted diluted EPS before restructuring charges for the fourth quarter to be approximately U.S. $0.38, up 27% from the corresponding quarter of fiscal 2006, and U.S. $0.01 per share below its previous EPS guidance range for the quarter. Adjusted diluted EPS before restructuring charges for the full fiscal year is still projected to be approximately U.S. $1.30 per share, up 24% compared to fiscal 2006.
>
> ***The Company has initiated its EPS guidance for fiscal 2008 with a range of U.S. $1.80 – U.S. $1.85 per share on a diluted basis, up approximately 39% - 42% from fiscal 2007.*** The projected growth in EPS in fiscal 2008 is driven primarily by the impact of relocating the Canadian textile operations and completing the ramp-up of the Company's offshore textile facilities in Honduras and the Dominican Republic, unit volume growth in activewear, and the expected EPS accretion from having completed the integration of Kentucky Derby Hosiery. [Emphasis added.]

18.    On September 18, 2007, the Company issued a press release entitled "Gildan Activewear Announces Acquisition of U.S. Sock Manufacturer."  Therein, the Company, in

relevant part, stated:

> ***Gildan Activewear Inc. (GIL; TSX and NYSE) today announced that it has entered into an agreement to purchase 100% of the capital stock of V.I. Prewett & Son, Inc. ("Prewett"), a large U.S. private label supplier of basic family socks to U.S. mass-market retailers,*** which is located in Fort Payne, Alabama. The initial purchase price is U.S. $125 million, with further contingent payments of up to U.S. $10 million. The purchase consideration will be paid in cash and will be financed out of Gildan's revolving bank credit facilities. The acquisition of Prewett, which is subject to U.S. regulatory approvals, is expected to close around the end of October 2007.
>
> Gildan and Prewett believe that the combination of the two companies will enhance the global cost-competitiveness of Prewett's basic athletic sock programs, and result in significant cost reduction synergies. At the same time, the companies have jointly developed an integration plan designed to ensure the continuation of Prewett's capabilities and reputation for outstanding customer service to mass-market retailers and to further strengthen Gildan's positioning as a full-product supplier of socks, activewear and underwear for the retail channel.
>
> Prewett currently has annualized sales of approximately U.S. $190 million. ***The acquisition of Prewett is expected to be accretive to Gildan's EPS in fiscal 2008, and to increase annual EPS by approximately U.S. $0.20 per share after the acquisition integration is complete. Based on the projected first year accretion from the Prewett acquisition, and a U.S. $7 million further incremental capacity expansion of Gildan's first Honduran sock manufacturing facility, Gildan now expects to achieve or exceed the high end of its previously announced earnings guidance range for fiscal 2008 of U.S. $1.80-$1.85 per share, representing an increase of over 40% compared with the Company's fiscal 2007 projected EPS of approximately U.S. $1.30 before restructuring charges.*** [Emphasis added.]

19.     In reaction to this news, shares of the Company's stock increased 13.42 percent, or $4.25 per share, to close on September 18, 2007 at $35.92 per share, on unusually heavy trading volume.

20.     On December 6, 2007, the Company issued a press release entitled "Gildan Activewear Announces Fourth Quarter and Full Year Fiscal 2007 Results, and Reconfirms EPS

Guidance for Fiscal 2008." Therein, the Company, in relevant part, stated:

### Fourth Quarter Sales and Earnings

*Gildan reported fourth quarter net earnings of U.S. $40.9 million and diluted EPS of U.S. $0.34, after recording a restructuring charge in the quarter of U.S. $4.9 million after-tax or U.S. $0.04 per share, which was primarily related to the previously announced restructuring of the Company's Canadian, Mexican and U.S. manufacturing facilities.* Before reflecting the restructuring charge, adjusted net earnings and adjusted diluted EPS for the fourth quarter of fiscal 2007 amounted to U.S. $45.8 million or U.S. $0.38, up respectively 24.5% and 26.7% from adjusted net earnings of U.S. $36.8 million and adjusted diluted EPS of U.S. $0.30 in the fourth quarter of fiscal 2006. The growth in EPS compared to last year was due to higher gross margins for activewear, continuing growth in activewear unit sales volumes and the impact of income tax recoveries, partially offset by lower activewear selling prices, higher raw material costs and higher selling, general and administrative and depreciation expenses. The impact of the Kentucky Derby Hosiery acquisition was U.S. $0.01 accretive to EPS in the fourth quarter, as the negative impact of consuming high-cost inventories manufactured by external contractors was more than offset by the favourable impact of recognizing the tax benefit of Kentucky Derby Hosiery losses for the full fiscal year.

*Sales in the fourth quarter amounted to U.S. $254.9 million, up 8.4% from U.S. $235.2 million in the fourth quarter of last year.* The increase in sales revenues was due to an 8.9% increase in unit sales volumes for activewear and a 15.7% increase in unit sales volumes for socks, partially offset by a 1.4% reduction in unit selling prices for activewear compared to last year.

\*     \*     \*

### EPS, Capital Expenditure and Free Cash Flow Guidance for Fiscal 2008

*The Company has reconfirmed its previous EPS guidance for fiscal 2008 of U.S. $1.85 per share,* up 43.4% from U.S. $1.29 per share, before restructuring and other charges, in fiscal 2007. Although a selling price increase in the screenprint channel is currently being successfully implemented, the Company believes that it is premature to increase its fiscal 2008 EPS guidance, partially due to inflationary pressures on energy, dye and chemicals costs and also due to the overall uncertainty at this stage

of the economic and market outlook for 2008. The Company is projecting EPS for the first quarter of fiscal 2008 of approximately U.S. $0.21 per share, up 50.0% from U.S. $0.14 in the first quarter of fiscal 2007. Projected results for the first quarter include the impact of the consumption of high-cost sock inventories produced during fiscal 2007, as well as the consumption of textiles produced in Canada prior to the closure of the Company's remaining Canadian textile facilities.

The Company is now projecting capital expenditures of approximately U.S. $140 million in fiscal 2008, compared with its previous estimate of U.S. $155 million. The reduction in projected capital expenditures is primarily due to delays in the timing of a major energy cost reduction project in Honduras, combined with below budget spending for the new activewear facility currently being ramped up to full capacity in Honduras. The Company is completing the ramp-up of its new sock and textile facilities in Honduras and intends to proceed with the construction of a previously announced second sock factory. The Company is also evaluating the timing and geographical location for future textile capacity expansion, to support its ongoing growth initiatives in the U.S. mass-market retail and international markets.

Including a projected reduction in inventories, the Company expects to generate free cash flow in fiscal 2008 in excess of U.S. $150 million, before taking account of its investment in the acquisition of V.I. Prewett & Son, Inc. [Emphasis added.]

21.    In reaction to this news, shares of the Company's stock increased 5.21%, or $1.95 perhsare, to close on December 6, 2007 at $39.35 per share, on unusually heavy trading volume.

22.    On January 15, 2008, the Company issued a press release entitled "Gildan to Present at Institutional Investor Conference." Therein, the Company, in relevant part, stated:

Gildan Activewear Inc. (GIL; TSX and NYSE) announced that Laurence G. Sellyn, Executive Vice President, Chief Financial and Administrative Officer, will present an overview of the Company's business plans and financial objectives at the Tenth Annual ICR XChange Conference in Dana Point, California, on Wednesday, January 16, 2008 at 1:25 p.m. PST.

At the conference, *the Company will reiterate that it continues to be comfortable with its most recent EPS guidance, provided on December 6, 2007, of approximately U.S. $1.85 for fiscal 2008, and confirm that it expects to achieve or exceed its EPS guidance*

*of U.S. $0.21 for the first quarter of fiscal 2008.* [Emphasis added.]

23.    On January 30, 2008, the Company issued a press release entitled "Gildan Activewear Announces 64.3% Increase in First Quarter EPS."   Therein, the Company, in relevant part, stated:

**First Quarter Sales and Earnings**

*Gildan reported first quarter net earnings of U.S. $27.5 million and diluted EPS of U.S. $0.23, up respectively 76.3% and 76.9% from net earnings of U.S. $15.6 million and diluted EPS of U.S. $0.13 in the first quarter of fiscal 2007.* Results for the first quarter of fiscal 2008 include a charge of U.S. $0.8 million to reflect ongoing carrying costs for Canadian and U.S. manufacturing facilities, pursuant to the closure of these facilities in fiscal 2007. Before reflecting restructuring charges in both fiscal years, adjusted net earnings for the first quarter were U.S. $28.3 million, or U.S. $0.23 per share, up respectively 66.5% and 64.3% from adjusted net earnings of U.S. $17.0 million, or U.S. $0.14 per share, in the first quarter of fiscal 2007. The growth in EPS was primarily due to higher unit sales volumes, selling prices and manufacturing efficiencies for activewear. As a result of the same factors, diluted EPS was U.S. $0.02 higher than the earnings guidance previously provided by the Company.

The acquisition of V. I. Prewett & Son, Inc. ("Prewett") was accretive by U.S. $0.01 per share in the quarter. Results for Prewett have been included with effect from the date of the acquisition on October 15, 2007.

*Sales in the first quarter, which is seasonally the lowest quarter of the fiscal year for sales of activewear, amounted to U.S. $250.5 million, up 34.8% from U.S. $185.8 million in the first quarter of last year.* The increase in sales revenues was due to an increase of 92.7% or U.S. $39.4 million in sock sales due to the acquisition of Prewett and new retail sock programs obtained in fiscal 2007, a 13.7% increase in unit sales volumes for activewear, and an increase of approximately 2.5% in activewear unit selling prices. The growth in sales was achieved in spite of the elimination during fiscal 2007 of unprofitable sock product-lines, which did not fit with Gildan's strategy.

\*      \*      \*

**Outlook**

***The Company has increased its EPS guidance for the full year to a range of U.S. $1.85-U.S. $1.90, up 43%-47% from adjusted net earnings of U.S. $1.29 per share in fiscal 2007.***

The impact of projected more favourable pricing in the wholesale channel, and of the Company's more favourable performance in the first quarter, is projected to be partially offset by a higher than previously anticipated income tax rate for the year, as well as the assumed impact of a proposed U.S. tariff on sock imports from Honduras in the third and fourth quarters.

The projected increase in EPS compared to fiscal 2007 reflects 14% projected growth in unit sales volumes for activewear and underwear, projected higher selling prices for activewear, projected manufacturing efficiencies as a result of completing the closures of the Company's Canadian textile manufacturing operations and consolidating activewear manufacturing offshore, and the impact of integrating the Company's sock acquisitions. The positive impact of these factors in fiscal 2008 is assumed to be partially offset by higher selling, general and administrative and depreciation expenses, projected increases in cotton, energy and transportation costs, and a higher effective income tax rate including the non-recurrence of income tax recoveries recorded in fiscal 2007.

The Company also indicated that it expects to report EPS of approximately U.S. $0.42 in the second quarter of the fiscal year, up 35.5% from adjusted EPS of U.S. $0.31 in the second quarter of fiscal 2007. [Emphasis added.]

24.     The statements contained in ¶¶17-18, 20 and 22-23 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's Dominican Republic textile facility was underperforming; (2) that as a result, sales of the Company's activewear were performing below expectations; (3) that the Company had materially overstated its financial results by failing to timely write-down an impairment in the value of its inventories; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

## The Truth Begins to Emerge

25.     On April 29, 2008, the Company shocked investors when it issued a press release

entitled "Gildan Activewear Reduces Guidance for Fiscal 2008 EPS Growth."  Therein, the

Company, in relevant part, stated:

> *Gildan Activewear Inc. (GIL; TSX and NYSE) announced that it expects to report adjusted diluted EPS of approximately U.S. $0.35 for its second quarter ended March 30, 2008, up approximately 13% from the second quarter of last year. The Company had previously projected EPS of approximately U.S. $0.42 for the second quarter of fiscal 2008. For the full 2008 fiscal year, the Company is now projecting adjusted diluted EPS of U.S. $1.45-$1.50, up 12%-16% compared to fiscal 2007. The Company's most recent EPS guidance, which was updated in January 2008, was U.S. $1.85-$1.90.*

> The lower than anticipated growth in EPS in the second fiscal quarter, compared to the Company's previous EPS guidance, is *primarily due to lower than projected unit sales growth in activewear as a result of a shortfall in production for the Dominican Republic textile facility, a write-down of inventories of discontinued retail productlines pursuant to the rationalization of Gildan's product-mix within the sock category, and additional costs incurred to service mass-market retailers during the integration of retail information systems.* These unfavourable variances were partially offset by more favourable activewear product-mix and lower than anticipated promotional discounts in the U.S. wholesale distributor channel.

> *The lower than anticipated production in the Dominican Republic textile facility will continue to prevent the Company from capitalizing on strong sales demand for its products in the second half of the fiscal year, in particular during the peak summer selling season for T-shirts in the third fiscal quarter, and also result in higher than projected manufacturing costs and supply chain inefficiencies.* In addition, the Company expects to be negatively impacted by higher than projected increases in freight and energy costs in the second half of the fiscal year. These factors are expected to be partially moderated by the impact of assumed more favourable selling prices in the U.S. screenprint channel in the third and fourth fiscal quarters, as a result of a recently announced selling price increase. [Emphasis added.]

26.     On this news, the Company's shares fell $10.99 per share, or 30.6 percent, to close

on April 29, 2008 at $24.93 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Gildan's securities between August 2, 2007 and April 29, 2008, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Gildan's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Gildan or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)      whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gildan; and

      (c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

33.     The market for Gildan's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Gildan's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Gildan's securities relying upon the integrity of the market price of Gildan's securities and market information relating to Gildan, and have been damaged thereby.

34.     During the Class Period, defendants materially misled the investing public,

thereby inflating the price of Gildan's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Gildan's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Gildan and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

36.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

37.     During the Class Period, Plaintiff and the Class purchased Gildan's securities at artificially inflated prices and were damaged thereby. The price of Gildan's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

causing investors' losses.

## SCIENTER ALLEGATIONS

38.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Gildan, their control over, and/or receipt and/or modification of Gildan's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Gildan, participated in the fraudulent scheme alleged herein.

39.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 2,523,300 shares of the Company's stock for gross proceeds of $94,465,751, including over $94 million in gross proceeds received by the Individual Defendants.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| February 14, 2008 | Martin, John | 10,000 | $39.40-$39.63 | $395,438 |
| December 21, 2007 | Sellyn, Laurence G. | 2,000 | $39.90-$40 | $79,859 |
| December 20, 2007 | Sellyn, Laurence G. | 18,000 | $40.13-$40.46 | $722,968 |
| December 5, 2007 | Chamandy, Glenn J. | 18,910 | $38.26 | $723,497 |
| November 19, 2007 | Chamandy, Glenn J. | 127,511 | $39.21 | $4,999,706 |
| November 14, 2007 | Chamandy, Glenn J. | 129,955 | $40.39 | $5,248,882 |
| November 13, 2007 | Chamandy, Glenn J. | 125,000 | $38.42 | $4,802,500 |

| November 12, 2007 | Chamandy, Glenn J. | 125,000 | $38.87 | $4,858,750 |
| November 6, 3007 | Chamandy, Glenn J. | 93,883 | $39.11 | $3,671,764 |
| November 5, 2007 | Chamandy, Glenn J. | 225,000 | $39.25 | $8,831,250 |
| October 10, 2007 | Chamandy, Glenn J. | 222,679 | $39.05 | $8,695,615 |
| October 9, 2007 | Chamandy, Glenn J. | 113,900 | $39.10 | $4,453,490 |
| October 8, 2007 | Chamandy, Glenn J. | 65,727 | $38.89 | $2,556,123 |
| October 4, 2007 | Chamandy, Glenn J. | 62,100 | $38.07 | $2,364,147 |
| October 3, 2007 | Chamandy, Glenn J. | 62,000 | $39.46 | $2,446,520 |
| October 1, 2007 | Chamandy, Glenn J. | 79,773 | $39.76 | $3,171,774 |
| September 21, 2007 | Chamandy, Glenn J. | 115,500 | $36.50 | 4,215,750 |
| September 21, 2007 | Chamandy, Glenn J. | 345,362 | $36.20 | $12,502,104 |
| September 19, 2007 | Chamandy, Glenn J. | 129,800 | $36.57 | $4,746,786 |
| September 18, 2007 | Chamandy, Glenn J. | 52,100 | $36.46 | $1,899,566 |
| September 11, 2007 | Chamandy, Glenn J. | 63,200 | $31.28 | $1,976,896 |
| September 6, 2007 | Chamandy, Glenn J. | 800 | $30.89 | $24,712 |
| September 5, 2007 | Chamandy, Glenn J. | 300 | $30.84 | $9,252 |
| September 4, 2007 | Chamandy, Glenn J. | 235,700 | $30.98 | $7,301,986 |
| August 10, 2007 | Chamandy, Glenn J. | 63,500 | $37.92 | $2,407,920 |
| August 9, 2007 | Chamandy, Glenn J. | 35,600 | $38.16 | $1,358,496 |
| | **TOTAL:** | **2,523,300** | | **$94,465,751** |

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

40.     At all relevant times, the market for Gildan's securities was an efficient market for

the following reasons, among others:

> (a)     Gildan's securities met the requirements for listing, and were listed and
>
> actively traded on the NYSE, a highly efficient and automated market;
>
> (b)     As a regulated issuer, Gildan filed periodic public reports with the SEC
>
> and the NYSE;
>
> (c)     Gildan regularly communicated with public investors _via_ established
>
> market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Gildan was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Gildan's securities promptly digested current information regarding Gildan from all publicly-available sources and reflected such information in the price of Gildan's securities. Under these circumstances, all purchasers of Gildan's securities during the Class Period suffered similar injury through their purchase of Gildan's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Gildan who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

43.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Gildan's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

45.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Gildan's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Gildan's financial

well-being, business relationships, and prospects, as specified herein.

47.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Gildan's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Gildan and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Gildan's securities during the Class Period.

48.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

49.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Gildan's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Gildan's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Gildan's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Gildan's securities during the Class Period at artificially high prices and were damaged thereby.

51.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

Gildan was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Gildan securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

52.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    The Individual Defendants acted as controlling persons of Gildan within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.    As set forth above, Gildan and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 3, 2008

**BRODSKY & SMITH, LLC**

By:_s/ Evan J. Smith, Esquire (ES3254)_
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
D. Seamus Kaskela
skaskela@sbtklaw.com
David M. Promisloff
dpromisloff@sbtklaw.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**Attorneys for Plaintiff**